IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| AURA TORRES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 11-3289-CV-S-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

### ORDER REVERSING THE DECISION OF THE COMMISSIONER AND REMANDING FOR FURTHER CONSIDERATION

Plaintiff Aura Torres seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity and in improperly denying plaintiff the opportunity to appear at her hearing and present testimony. I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. The ALJ relied on testimony from the vocational expert that plaintiff could perform other jobs available in significant numbers; however, the ALJ did not ask the vocational expert whether those jobs could be performed by someone who may not be proficient in English. Although the ALJ found that plaintiff can communicate in English, there was no discussion of this finding and no citation to the record. Further, plaintiff indicated in her administrative paperwork that she could not communicate in English, all of the documents sent to plaintiff were in Spanish, and her daughter completed her paperwork for her. Because the ALJ did not address this issue in his order, there is insufficient evidence to support his overall finding. Therefore, the decision of the Commissioner will be reversed and this case will be remanded for further consideration.

## I.    BACKGROUND

On October 17, 2008, plaintiff applied for disability benefits alleging that she had been disabled since June 30, 2007. Plaintiff's disability stems from obesity, pituitary adenoma,[1] hyperparathyroidism[2] with pancreatitis,[3] kidney stones,[4] mild lumbar disc disease,

---

[1] "Pituitary adenomas are common benign tumors of the pituitary gland. It is said that up to 10% of people will have a pituitary adenoma (which might never have caused a problem) by the time of their death. Some tumors secrete one or more hormones in excess. Such so-called secretory pituitary adenomas are usually found due to hormonal imbalances that affect bodily functions. They may be relatively small when detected."
http://www.hopkinsmedicine.org/neurology_neurosurgery/specialty_areas/pituitary_center/pituitary-tumor/types/pituitary-adenoma.html

[2] Hyperparathyroidism is an excess of parathyroid hormone in the bloodstream due to overactivity of one or more of the body's four parathyroid glands. The parathyroid glands produce parathyroid hormone, which helps maintain an appropriate balance of calcium in the bloodstream and in tissues that depend on calcium for proper functioning. Two types of hyperparathyroidism exist. In primary hyperparathyroidism, an enlargement of one or more of the parathyroid glands causes overproduction of the hormone resulting in high levels of calcium in the blood (hypercalcemia), which can cause a variety of health problems. Secondary hyperparathyroidism is a result of another disease that causes low levels of calcium in the body. Surgery is the most common treatment for hyperparathyroidism.
http://www.mayoclinic.com/health/hyperparathyroidism/DS00396

[3] Pancreatitis is inflammation in the pancreas. The pancreas produces enzymes that help digestion and hormones that help regulate the way the body processes sugar (glucose). Pancreatitis can occur as acute pancreatitis -- meaning it appears suddenly and lasts for days. Or pancreatitis can occur as chronic pancreatitis, which describes pancreatitis that occurs over many years. Mild cases of pancreatitis may go away without treatment, but severe cases can cause life-threatening complications.
http://www.mayoclinic.com/health/pancreatitis/DS00371

[4] Kidney stones (renal lithiasis) are small, hard deposits that form inside the kidneys. The stones are made of mineral and acid salts. Kidney stones have many causes and can affect any part of the urinary tract, from the kidneys to the bladder. Often, stones form when the urine becomes concentrated, allowing minerals to crystallize and stick together. Passing kidney stones can be quite painful, but the stones usually cause no permanent damage. Someone passing a kidney stone may need nothing more than to take pain medication and drink lots of water to pass a kidney stone. In other instances, surgery may be needed.
http://www.mayoclinic.com/health/kidney-stones/DS00282

2

abdominal hernia,[5] degenerative arthritis of the bilateral knees, recurrent prolactin secreting tumor (the same thing as a pituitary adenoma), thyromegaly (abnormally enlarged thyroid gland), decreased vision, migraines, probable lipoma[6] of the xiphoid[7] area, diabetes, gastroesophageal reflux disease,[8] status-post transsphenoidal pituitary surgery,[9] nausea and vomiting after standing and walking, deficiencies in concentration, fatigue, confusion,

---

[5]A hernia is a protrusion of a portion of an organ or tissue through an abnormal opening. An abdominal hernia is one through the abdominal wall, either a congenital defect or a complication of pregnancy or a surgical incision.

[6]"A lipoma is a slow-growing, fatty lump that's most often situated between your skin and the underlying muscle layer. Often a lipoma is easy to identify because it moves readily with slight finger pressure. It's doughy to touch and usually not tender. You may have more than one lipoma. Lipomas can occur at any age, but they're most often detected during middle age. A lipoma isn't cancer and is usually harmless. Treatment generally isn't necessary, but if the lipoma bothers you, is painful or is growing, you may want to have it removed." http://www.mayoclinic.com/health/lipoma/DS00634

[7]The bottom of the sternum.



[8]Gastroesophageal reflux disease (GERD) is a chronic digestive disease that occurs when stomach acid or, occasionally, bile flows back (refluxes) into the food pipe (esophagus). The backwash of acid irritates the lining of the esophagus and causes GERD signs and symptoms whch include acid reflux and heartburn. Both are common digestive conditions that many people experience from time to time. When these signs and symptoms occur at least twice each week or interfere with daily life, doctors call this GERD. http://www.mayoclinic.com/health/gerd/DS00967

[9]An incision is made in the back wall of the nose and the sphenoid sinus is entered directly in order to remove a pituitary adenoma. It is also possible to make an incision along the front of the nasal septum, and make a tunnel back to the sphenoid sinus. Finally, it is possible to make an incision under the lip and approach through the upper gum, and enter the nasal cavity and then the sphenoid sinus.
http://pituitary.mgh.harvard.edu/TranssphenoidalSurgery.htm

3

depression, swelling of the hands and feet, blurred vision, cold sweats, anxiety, shortness of breath with exertion, difficulty balancing and inability communicate in English.[10]  Plaintiff's application was denied initially on December 19, 2008, and on reconsideration on March 13, 2009.  On October 28, 2009, a hearing was held before an Administrative Law Judge; however, plaintiff failed to appear for that hearing.  On July 23, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act.  On May 27, 2011, the Appeals Council denied plaintiff's request for review.  Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities &

---

[10] Although plaintiff argues in her brief that an inability to communicate in English is an impairment, she did not list this as an impairment in her disability application.  However, she did state that she cannot communicate in English and request that her paperwork be sent in Spanish.

Case 6:11-cv-03289-REL   Document 21   Filed 02/15/13   Page 4 of 17

Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.    Is the claimant performing substantial gainful activity?

>    Yes = not disabled.
>    No = go to next step.

5

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

>   No = not disabled.
>   Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

>   Yes = disabled.
>   No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

>   No = not disabled.
>   Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

>   Yes = disabled.
>   No = not disabled.

## IV. THE RECORD

The record consists of the testimony of vocational expert Jennifer Ann Maginnis, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

On October 17, 2008, a Disability Report - Adult was completed by plaintiff's daughter, Venus Torres, using an on-line form (Tr. at 204-214). Plaintiff indicated that she does not speak and understand English (Tr. at 204). Her preferred language is Spanish (Tr. at 204).

On October 29, 2009, a NOTICE TO SHOW CAUSE FOR FAILURE TO APPEAR was mailed to plaintiff (Tr. at 111-112). The notice said:

> You did not appear at your scheduled hearing. My notice of September 21, 2009, told you that I would hear your case on October 28, 2009, at 10:00 AM Central (CT). Although you failed to provide an explanation for not appearing at your hearing, you now have another opportunity to explain your absence.

6

> To show good cause, you must send me a written statement with a good reason why you did not appear at the time set for the hearing **and explain to the Administrative Law Judge why should he schedule a supplemental hearing to take your testimony.** You must send the statement to the address shown above by November 13, 2009.
>
> I will consider a statement you send me by that date to see if it shows good cause. In deciding if you have shown good cause, I will consider rules stated in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J, Sections 404.911, 404.936, and 404.957(b)) and Part 416 (Subpart N, Sections 416.1411, 416.1436, and 416.1457(b)).
>
> If you show good cause, I will again set a time and place to hear your case. If you do not show good cause, I will dismiss your request for hearing.

(Tr. at 111).

The same notice was sent in English and in Spanish to plaintiff and her attorney of record (Tr. at 113-114, 115-116).

The record establishes that plaintiff earned the following income from 1978 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1978 | $ 0.00 | 1995 | $ 7,143.00 |
| 1979 | 0.00 | 1996 | 5,911.25 |
| 1980 | 0.00 | 1997 | 5,886.25 |
| 1981 | 0.00 | 1998 | 11,365.55 |
| 1982 | 0.00 | 1999 | 10,898.76 |
| 1983 | 2,597.04 | 2000 | 8,902.31 |
| 1984 | 0.00 | 2001 | 5,313.09 |
| 1985 | 0.00 | 2002 | 0.00 |
| 1986 | 178.50 | 2003 | 0.00 |
| 1987 | 0.00 | 2004 | 4,618.00 |
| 1988 | 77.88 | 2005 | 0.00 |
| 1989 | 184.69 | 2006 | 0.00 |
| 1990 | 1,129.25 | 2007 | 832.58 |
| 1991 | 5,233.35 | 2008 | 0.00 |
| 1992 | 6,609.72 | 2009 | 0.00 |

| | | | |
|---|---|---|---|
| 1993 | 7,466.86 | 2010 | 0.00 |
| 1994 | 8,743.03 | | |

(Tr. at 175-186).

### B. *SUMMARY OF MEDICAL RECORDS*

On August 3, 2007, plaintiff was treated at Parkland Hospital, where she was diagnosed in part with having diabetes mellitus, benign neoplasm of the pituitary gland, renal lesion, and fatty liver (Tr. at 366). Plaintiff's history was also noted, which included pituitary surgery of 1991, and kidney stones (Tr. at 366).

On August 23, 2007, examining and treating physician, Mary Rivero, M.D., found that because of muscle deconditioning, plaintiff was restricted to lifting up to five to ten pounds, but otherwise could work (Tr. at 271).

On August 28, 2007, plaintiff underwent an MRI for her brain, which revealed status-post transphenoidal pituitary, and soft tissue in the sella tucica floor consistent with residual/recurrent disease (Tr. at 318).

On February 28, 2008, plaintiff was treated at Parkland Hospital, where she was diagnosed with benign neoplasm of aortic body and other paraganglia,[11] galactorrhea[12] not

---

[11] A collection of cells that came from embryonic nervous tissue, and are found near the adrenal glands and some blood vessels and nerves. Most paraganglia secrete epinephrine and norepinephrine.

[12] "Galactorrhea is a milky nipple discharge unrelated to the normal milk production of breast-feeding. Galactorrhea itself isn't a disease, but it could be a sign of an underlying problem. It usually occurs in women, even those who have never had children or after menopause. But galactorrhea can happen in men and even in infants. Excessive breast stimulation, medication side effects or disorders of the pituitary gland all may contribute to galactorrhea. Often, galactorrhea results from increased levels of prolactin, the hormone that stimulates milk production. Sometimes, the cause of galactorrhea can't be determined. The condition may resolve on its own."
http://www.mayoclinic.com/health/galactorrhea/DS00761

8

associated with childbirth, and diabetes mellitus, without complication, type II, uncontrolled (Tr. at 308).

On September 10, 2008, an ultrasound revealed the following:

1) fatty infiltration of the liver;

2) localized isoechoic bulge at the lower pole of the right kidney;

3) probable subcutaneous lipomas in the midline epigastric region in the right upper quadrant; and

4) incomplete evacuation of the head and tail of the pancreas secondary to obscuration by a bowel gas shadow.

(Tr. at 302).

On October 15, 2008, plaintiff was seen and treated at Parkland Hospital for elevated calcium (Tr. at 375).

On December 2, 2008, plaintiff was treated at Parkland Hospital, where a study of her kidneys revealed decreased function of the right kidney (Tr. at 362).

On December 3, 2008, Harold Nachimson, M.D., examined plaintiff; however, it is unclear why he performed the examination as he stated, "There is no specific or implied warranty, nor a doctor/patient relationship established." (Tr. at 346-349). Plaintiff reported that approximately 20 years earlier, after the birth of her only child, she developed persistent galactorrhea (see footnote 12) and amenorrhea.[13] Plaintiff had a pituitary adenoma (see footnote 1) treated in 1991 and two kidney stones on her right side in 2006 with

---

[13]"Amenorrhea is the absence of menstruation -- one or more missed menstrual periods. Women who have missed at least three menstrual periods in a row have amenorrhea, as do girls who haven't begun menstruation by the age of 16. The most common cause of amenorrhea is pregnancy. Other causes of amenorrhea include problems with the reproductive organs or with the glands that help regulate hormone levels. Treatment of the underlying condition often resolves amenorrhea."
http://www.mayoclinic.com/health/amenorrhea/DS00581

9

hypocalcaemia.[14] Plaintiff's doctor eventually found her to have hyperparathyroidism (see footnote 2) and was planning surgical correction. Plaintiff also reported having pancreatitis (see footnote 3) over the years. On examination, plaintiff's blood pressure was 134/93. Nevertheless, her examination was generally normal. Her gait was waddling and antalgic due to pain in her knees but plaintiff was able to tiptoe and heel stand. Her lower extremities had no edema with normal length and without evidence of atrophy. Plaintiff's upper extremities were normal but there was some tenderness of the PIP joints of both hands. Plaintiff's muscle strength was 5/5 and her cranial nerves were intact. Dr. Nachimson diagnosed plaintiff with:

1) prolactin secreting tumor;

2) hyperparathyroidism with pancreatitis;

3) kidney stones;

4) lumbar myofascitis with possible lumbar discogenic disease;

5) thyromegaly;

6) probable lipoma of the xiphoid area;

7) abdominal hernia;

8) diabetes, type II;

9) GERD;

10) probable degenerative arthritis of both knees; and

11) obesity with a BMI of 41.

Some of these diagnoses were clearly by report only (for example, plaintiff merely reported that she has GERD and pancreatitis). Dr. Nachimson stated that his opinion was based on a

---

[14]Hypocalcemia is caused by loss of calcium from or insufficient entry of calcium into the circulation.
http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/endocrinology/hypocalcemia/

review of the records, the physical examination of plaintiff, and an interview with plaintiff "who required Spanish translation"; however, Dr. Nachimson did not offer any opinion other than the above-listed diagnoses (Tr. at 349). Specifically, there was no discussion or opinion offered as to what she could or could not do.

On December 4, 2008, plaintiff was treated at Parkland Hospital, where she received a complete work-up for hyperparathyroidism (see footnote 2) (Tr. at 336-337).

On December 19, 2008, state agency physician, Roberta Herman, M.D., reviewed plaintiff's file and determined that plaintiff could perform light capacity work, and occasionally climb, balance, stoop, kneel, crouch, and crawl (Tr. at 338-345). Dr. Collier, another state agency medical consultant, reviewed the evidence of record and agreed with Dr. Herman's functional capacity assessment (Tr. at 352).

On January 8, 2009, plaintiff was treated at Parkland Hospital, where she was diagnosed with diabetes mellitus II (Tr. at 358).

On February 5, 2009, plaintiff was treated at Parkland Hospital for prolactinoma,[15] hyperparathyroidism, vitamin D deficiency, and diabetes mellitus (Tr. at 370).

On March 19, 2009, plaintiff was treated at Parkland Hospital, for prolactinoma, hyperparathyroidism, vitamin D deficiency, and diabetes mellitus (Tr. at 427).

On May 13, 2009, a biopsy revealed that plaintiff had a left thyroid nodule (Tr. at 404-406).

---

[15]"Prolactinoma is a condition in which a usually noncancerous tumor (adenoma) of the pituitary gland in your brain overproduces the hormone prolactin. The major effect of increased prolactin is a decrease in levels of some sex hormones -- estrogen in women and testosterone in men. Although prolactinoma isn't life-threatening, it can impair your vision, cause infertility and produce other effects. Prolactinoma is one of several types of tumors that can develop in your pituitary gland. Doctors can often effectively treat prolactinoma with medications to restore your prolactin level to normal. Surgery to remove the pituitary tumor also may be an option to treat prolactinoma."
http://www.mayoclinic.com/health/prolactinoma/DS00532

On August 13, 2009, plaintiff underwent parathyroidectomy surgery at Parkland Hospital, and sought treatment for postoperative matters thereafter (Tr. at 435, 440).

C. *SUMMARY OF TESTIMONY*

During the October 28, 2009, hearing, vocational expert Jennifer Maginnis testified at the request of the ALJ. Plaintiff did not appear at the hearing, but her attorney was present (Tr. at 34). Someone representing herself to be plaintiff had called the ALJ's office that morning and reported that she was not coming to the hearing; however, she did not provide a reason (Tr. at 34, 35). Plaintiff was told by the receptionist that it would be up to the ALJ whether to reschedule the hearing or dismiss the case, and plaintiff stated that she understood (Tr. at 34). The receptionist then transferred plaintiff to Linda Anderson, senior case technician (Tr. at 34). The ALJ told plaintiff's attorney he would take the testimony of the vocational expert and then send plaintiff a notice to show cause why a hearing should be rescheduled (Tr. at 35). "If she shows good cause, I'll schedule a supplemental hearing. If she doesn't, I won't. And I'll decide the case on the record." (Tr. at 35). Plaintiff's attorney said, "Understood, Your Honor." (Tr. at 35).

The first hypothetical involved a person between the ages of 44 and 46 with a 12th grade education who has past relevant work as a sales clerk and cashier who can perform sedentary work of lifting up to ten pounds occasionally, standing and walking for two hours per day, sitting for six hours per day, and performing all postural functions occasionally, such as balancing, climbing, stooping, crouching, crawling, and kneeling (Tr. at 39-40). The vocational expert testified that such a person could not do plaintiff's past relevant work but could work as an order clerk, DOT 209.567-014, with 26,300 in the country and 1,500 in the state of Texas;[16] a charge account clerk, DOT 205.367-014, with 16,000 in the country

---

[16]Plaintiff's hearing was held in Texas.

and 1,200 in the state; or a telequotation clerk, DOT 237.367-046, with 24,000 in the country and 1,450 in the state (Tr. at 39-40).

The second hypothetical involved a person who could perform light work by lifting and carrying 20 pounds occasionally and ten pounds frequently, standing and walking for six hours each day, sitting for six hours each day, and performing all of the postural functions occasionally (Tr. at 40-41). Such a person could perform plaintiff's past relevant work (Tr. at 41).

The typical tolerance for absenteeism is one to two absences per month (Tr. at 41).

The ALJ concluded the hearing with the following: "That concludes the hearing subject to the claimant being able to show good cause to schedule a supplemental hearing." (Tr. at 41).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge J. Michael Brounoff entered his opinion on July 23, 2010 (Tr. at 22-31). He noted that plaintiff filed a prior claim on September 27, 2006, with an alleged onset date of July 15, 2001 (Tr. at 23). She did not further pursue that claim, and the ALJ found that plaintiff was not requesting that the prior application be reopened (Tr. at 23).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date of June 30, 2007 (Tr. at 25).

Step two. Plaintiff has the following severe impairments: Obesity, pituitary adenoma, hyperparathyroidism with pancreatitis, kidney stones, mild lumbar disc disease, abdominal hernia and degenerative arthritis of the knees (Tr. at 25). The record fails to establish that hypertension, diabetes, GERD, lipomas, galactorrhea, decreased right kidney function and vitamin D deficiency result in any discernable limitations and therefore those impairments are not severe (Tr. at 25). Plaintiff's "acute emergency room visits" do not meet the 12-month

durational requirement of the Social Security Act (Tr. at 25). There is a lack of objective medical evidence to support a finding that plaintiff's headaches meet the requirements of a medically determinable impairment (Tr. at 25).

Step three. Plaintiff's severe impairments to not meet or equal a listed impairment (Tr. at 26).

Step four. Plaintiff retains the residual functional capacity to perform a reduced range of sedentary work (Tr. at 26). She can lift and carry ten pounds, sit for six hours, stand and walk combined for two hours, and is limited to no more than occasional climbing, stooping, balancing, kneeling, crouching and crawling (Tr. at 26). With this residual functional capacity, plaintiff cannot perform her past relevant work as a sales clerk or cashier (Tr. at 29).

Step five. Plaintiff can perform other work available in significant numbers in the economy, such as order clerk, charge account clerk, or telephone quotation clerk (Tr. at 29-30). Therefore, plaintiff is not disabled (Tr. at 30-31).

## VI.   *PLAINTIFF'S ABILITY TO COMMUNICATE IN ENGLISH*

Plaintiff argues that the ALJ erred in finding that plaintiff could perform other jobs without making a proper determination about her ability (or lack thereof) to communicate in English.

The ALJ did not address proficiency in English when posing hypotheticals to the vocational expert, nor did he address this issue in his order. He simply stated, "The claimant . . . is able to communicate in English." (Tr. at 29). On her alleged onset date, plaintiff was 44 years of age which is defined as a younger individual, age 18-44. She "subsequently changed age category to a younger individual age 45-49." (Tr. at 29).

20 C.F.R. Pt. 404, Subpt. P, Appendix 2 to Subpart P of the Medical Vocational Guidelines, § 201.00(h)(1) provides:

The term younger individual is used to denote an individual age 18 through 49. For individuals who are age 45-49, age is a less advantageous factor for making an adjustment to other work than for those who are age 18-44. Accordingly, a finding of "disabled" is warranted for individuals age 45-49 who: . . .

> (iv) Are unable to communicate in English, or are able to speak and understand English but are unable to read or write in English.

Section 201.00(i) provides:

> While illiteracy or the inability to communicate in English may significantly limit an individual's vocational scope, the primary work functions in the bulk of unskilled work relate to working with things (rather than with data or people) and in these work functions at the unskilled level, literacy or ability to communicate in English has the least significance. Similarly the lack of relevant work experience would have little significance since the bulk of unskilled jobs require no qualifying work experience. Thus, the functional capability for a full range of sedentary work represents sufficient numbers of jobs to indicate substantial vocational scope for those individuals age 18-44 even if they are illiterate or unable to communicate in English.

During the relevant time period, plaintiff was both a "younger individual age 18-44" and a "younger individual age 45-49." The ALJ did not analyze plaintiff's ability to communicate in English; however, defendant in his response to plaintiff's brief argues as follows:

> Plaintiff notes that she requested her notices to be sent in Spanish when she filed for benefits. Plaintiff's Brief, pp. 10-12. While Plaintiff may be more comfortable communicating in Spanish, the record reveals that she can speak and understand English. In fact, Plaintiff called in the day of her hearing and indicated that she could not come to the hearing (Tr. 162). She was told that it was up to the ALJ as to whether her hearing would be rescheduled or dismissed and Plaintiff indicated that she understood (Tr. 34). These contacts with Plaintiff show that she can speak and understand English.
>
> Moreover, Plaintiff has past relevant work as a sales clerk and cashier which required an ability to speak English (Tr. 38, 175-83, 206). In addition, Plaintiff did not request that she have an interpreter for her hearings. Plaintiff asserts that the ALJ did not consider her inability to speak English. Plaintiff's Brief, p. 13. On the contrary, the ALJ specifically found that Plaintiff could communicate in English (Tr. 29). Substantial evidence supports the ALJ's finding (Tr. 29).

The record shows that plaintiff's daughter completed all of her administrative documents and indicated that plaintiff does not communicate in English. All of the

15

administrative forms were sent to plaintiff in both English and Spanish. The fact that she did not specifically request an interpreter for the hearing is not relevant unless defendant can show that plaintiff was told she would need to make an additional request for an interpreter, even though she had already requested that all documents be sent to her in Spanish. There is no evidence that plaintiff, and not her daughter or someone else, was the one who called in to say she would not be at the hearing. Furthermore, it is possible that plaintiff did call to say she would not be present but was unable to provide a reason due to her inability to speak much English. The fact that she worked as a sales clerk and cashier in Texas does not provide evidence that she speaks English -- there are many locations in Texas (and elsewhere in the United States) where employees do not speak English despite working with the public, especially if those places are located in predominantly Spanish-speaking areas.

It may very well be that plaintiff communicates just fine in English. However, the ALJ did not describe any evidence to support his finding that plaintiff can communicate in English. Rather, it appears to be part of a boilerplate finding, and in most cases such a finding without further discussion is perfectly fine.[17] However, in this case, the ALJ found that plaintiff could perform not the full range of unskilled work as referred to in 20 C.F.R. Pt. 404, Subpt. P, Appendix 2 to Subpart P of the Medical Vocational Guidelines, § 201.00(i). Rather, the ALJ found that plaintiff was limited to sedentary work, further limited by an inability to climb, stoop, balance, kneel, crouch and crawl more than occasionally. The vocational expert testified that such a person could work as an order clerk, a charge account clerk, or a

---

[17]I note that the order refers to the claimant as "he/she" which is why I describe the order as an apparent boilerplate order. I mean no criticism by this comment -- it is not only reasonable but necessary for Administrative Law Judges and District Court Judges to avoid, as much as practicable, "reinventing the wheel" as to every aspect of an order in disability cases, given the explosion of applications in recent years.

16

telequotation clerk. There was no evidence of whether an inability to communicate proficiently in English would affect the hypothetical person's ability to perform these jobs.

## VIII. CONCLUSIONS

Many of plaintiff's alleged impairments would not seem to have any impact on her ability to perform work-related functions. In fact, plaintiff does not describe any limitations in her summary of medical records other than pointing out that one doctor found that she could only lift five to ten pounds but could otherwise work. Finally, I note that plaintiff's list of impairments is almost as long as her summary of the medical records, which certainly lends support to the ALJ's overall finding. However, I cannot find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff can perform other jobs in the economy when no evidence has been presented on plaintiff's ability to communicate in English, no support has been listed for the ALJ's finding that she can communicate in English, and the vocational expert was not asked how a lack of English proficiency (if there indeed is one) would affect plaintiff's ability to perform the clerical jobs listed.

Based on all of the above, I find that the substantial evidence in the record as a whole does not support the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that pursuant to Sentence Four this case is reversed and remanded for further consideration.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 14, 2013